MARSHALL CONSTRUCTION COMPANY, INC., Claimant, *v.* THE STATE OF NEW YORK, Defendant.

Claim No. 18607.

Court of Claims, November 9, 1928.

*Benjamin McClung* [*Charles B. Sullivan* of counsel], for the claimant.

*Albert Ottinger, Attorney-General* [*J. D. Wilson, Jr., Deputy Assistant Attorney-General,* of counsel], for the defendant.

GIBSON, J. This claim arises out of a highway reconstruction contract, with Federal aid, entered into by the claimant and the State of New York in July, 1926. A portion of the work was in Briarcliff Manor village, a portion in Ossining village and the connecting link, a total of one and sixty-seven one-hundredths miles. Formerly there had been a brick pavement over a part of this distance and over the remainder a six-inch concrete foundation covered with two inches of asphalt. Where the brick pavement existed the contractor was to reduce its width to twenty feet and add on each side thereof a strip of concrete eight feet in width, making the highway thirty-six feet wide. The concrete and asphalt pavement was to be replaced by an eight-inch concrete pavement thirty-six feet in width.

Under item 1 claim is made for 4,305 cubic yards on unclassified

excavation at the contract price of one dollar and forty cents per cubic yard. This amount of material was excavated to provide a space six inches below the under side of the new concrete pavement where the road was to be built thirty-six feet wide and where the two eight-foot strips were to be added. In this space was placed three inches of sub base and three inches of gravel or other fine material for a cushion. After the sub base had been compressed and the cushion compressed with a ten-ton roller the concrete pavement was laid. To determine the claimant's right to payment a construction of the contract is necessary. The State contends that payment was to be made for excavation below the bottom line of the new concrete in those places only where rock existed. The claimant contends that the contract required it to excavate six inches below the bottom line of the new pavement wherever it was to be laid. Each refers to a " typical section," shown on the plans as authority for its position.

Upon the 1st page of the plans there are two " typical sections," one relating to the pavement to be constructed thirty-six feet in width and one to the sixteen-foot widening. Under the former appear the words " maximum payment line for unclassified excavation Item 4," from which run arrows pointing right and left. Upon the right side of this typical section the arrows run to a line six inches below the finished pavement. Directly above this line are irregular hatched figures somewhat triangular in shape extending three inches above the line and above these figures is a blank space of three inches between the hatching and the under side of the new pavement. The arrows running to the left side of this typical section end at the bottom of the new pavement. The other typical section is entitled " typical section showing 16' widening," and the above description of the first typical section accurately describes the second with the exception that it only applies to the two eight-foot strips. On the right the maximum payment line is indicated as six inches below the finished pavement with the hatching and open space and on the left the maximum payment line is indicated as being at the bottom of the finished pavement. A determination of the meaning of the hatched symbol on the left of these sections will decide the controversy. Claimant's engineer testified that this symbol was used to indicate rock, but in this case it indicated the old roadway spread out under the road. The engineer in charge of construction for the State testified that it was a symbol of a rock cut. Had this symbol extended all the way across the first typical section and under the left as well as the right side of the section I would be inclined to hold that it indicated a rock fill with a cushion upon it, but

I am unable to take the view which would result in holding that the maximum payment on the right side of the road was six inches below the finished concrete while on the left-hand side the payment line was at the bottom of the finished concrete. It is well known that you cannot excavate to a line in rock and an allowance is made for going below the line in order to get all the rock surface below grade. That appears to have been the purpose here and I construe the plans to mean that where rock was encountered claimant would be paid for six inches of excavation below the under side of the new pavement. For excavation in such areas it has been paid. If I have interpreted the plans rightly, the maximum payment line for excavation is the lower side of the pavement except in places where rock is encountered and in such locations the maximum payment line is six inches below the lower side of the pavement. Claimant cannot recover for the excavation of material outside the excavation lines as shown on the plans. (*O'Brien* v. *Mayor, etc., of N. Y.*, 139 N. Y. 543, 585; *Empire Engineering Corp.* v. *State*, 1 State Dept. Rep. [unof.] 326; *Burgard* v. *State*, 17 State Dept. Rep. 1, 68, 70; *Pearson & Son, Inc.*, v. *State*, 112 Misc. 29.)

Under item 2 claim is made for the excavation of 542 cubic yards of rock at the fair and reasonable cost of six dollars per yard less one dollar and forty cents per yard allowed claimant by the State. This claim arises out of these circumstances: Between stations 1202 and 1207 a rock cut was required on the easterly side of the road to accommodate the new road of greater width. This cut was on a curve which required banking on the westerly side. The first work of claimant was in this cut. The engineer for the State staked out the lines and grades, the contractor excavated the rock, graded the road and built the embankment in accordance with the lines given him by the State and moved his equipment to another part of the contract. Later the engineer in charge for the State moved the center line of the road easterly six feet and required the claimant to excavate six feet further into the rock ledge, which claimant did under protest There is a dispute as to whether the contractor excavated to the lines as given it in the first instance but I am convinced by the evidence and the surrounding circumstances that he did. The first cut, the grading and the embankment were all done under the daily supervision of the engineer for the State and he testifies that it was not up to him to call their attention to the fact that they were not taking it all out and that his only duty there was to provide the grade stakes and it was none of his business to see what they were doing after he set the stakes. He had of course no authority to

direct the contractor how it should perform the contract or the order of performance but it is incredible that he observed the contractor completing the grading and embankment for the entire width of the road and said nothing about its being six feet out of line. I think there was a mistake in giving the lines in the first instance. The actual position of the center line of the road must be susceptible of proof from surveys made by the State but no evidence was offered to show the location.

Thus the contractor was required to do more work between station 1202 and station 1207 than the contract called for. He had " an election either to refuse to proceed and recover upon a *quantum meruit* for the work already done or to continue under protest and recover the value of the extra work upon a *quantum meruit* as the measure of damages for the breach of contract." (*Lentilhon* v. *City of New York*, 102 App. Div. 548, 557; affd., 185 N. Y. 549. See, also, *Borough Construction Co.* v. *City of New York*, 200 N. Y. 149; *Gearty* v. *Mayor, etc., of New York*, 171 id. 61.)

That the work be done under protest is a condition precedent to a recovery. Such a condition is founded in justice and equity. The contractor is not permitted to acquiesce in the directions of the representative of the owner and after performing the work with seeming willingness recover on the ground that the directions were erroneous. A protest calls the attention of the owner to a difference of opinion as to the requirements of the contract and gives him the opportunity before the work is done to make a determination. He is not lulled into security by the seeming agreement of his contractor only to be aroused by a claim for damages which may arise solely as an afterthought.

Under item 3, claim is made for the removal of 10,351 cubic yards of so-called Telford pavement. It was discovered after the old asphalt and concrete pavement was removed that at some time the road had been sub based with rocks and boulders some of them a cubic yard in dimension. It was impossible to blast or cut off a few inches of these stones in order to bring the road to grade while by leaving them in place the State would have had a foundation which had been solidifying for years with only a change of an inch or two in the elevation of the road. The State officials refused to permit claimant to build on this solid foundation but directed him to keep to the plans. In order to do so claimant was required to take out this whole mass of boulders averaging in depth two feet and six inches, break up the larger ones and replace the stone so that the concrete when laid would conform to the grade shown on the plans. This contingency was unforeseen. There is no evidence as to when this Telford was placed or by whom. The

claimant was unable to take the few inches necessary from the top of these stones and by direction of the State he removed them all.

In reaching this conclusion I accept the evidence of the claimant's witnesses that the old Telford was composed of boulders, some a cubic yard in dimension, many the size of a bushel basket, and the excavation thereof comes fairly within the itemized specification accompanying the contract in relation to excavation which reads in part as follows: " F. Subgrade. The contractor shall remove boulders and all muck, quicksand, soft clay, spongy material and any other objectional matter, as directed by the engineer."

There is no dispute as to the amount of the excavation and under this item the claimant should have an award for 10,351 cubic yards of excavation at the contract price of one dollar and forty cents per cubic yard.

POTTER, J., concurs.